**AFFIDAVIT**

I, Matthew K. O'Neill, being duly sworn, depose and say:

1.   I am a Special Agent with the U.S. Secret Service, and have been so employed since December 21, 1998.  I am currently assigned to the Manchester, NH Resident Office.

2.   In preparation for my employment with the Secret Service, I completed training at the Federal Law Enforcement Training Center in Glynco, GA; and also completed training with the Secret Service in our academy in Maryland.  In addition to the aforementioned basic training classes I completed numerous in-services training courses related to constitutional law, criminal investigation, and a variety of financial crimes and fraud schemes.

3.   My present duties include the investigation of federal offenses, including, but not limited to those involving access device fraud and its related activities, all of which are punishable under the laws of the United States.

4.   I submit this affidavit to establish probable cause in support of a Criminal Complaint against, charging Fraud by wire, radio, or television, in violation of Title 18 United States Code § 1343.

5.   As described herein, information has come to my attention showing that Paul Ubsdell and Mark Britain were involved with Ahmed Shaaban in a scheme to defraud Oppenheimer $ Co., Inc., an investment bank, (Oppenheimer), by causing

Oppenheimer to:  1) take custody of $150,000,000 worth of fraudulent, worthless bonds; 2) issue a line of credit equal to 90% of $150,000,000 using those bonds as collateral; and 3) drawing money from the line of credit with no intention of Oppenheimer being able to liquidate the bonds to cover the line of credit.  As set forth below, in furtherance of the scheme, $150,000 was wired into an account of CW#1 who, as is set forth below, was thought by the defendants to be in a position to effectuate Oppenheimer's participation.  In so doing they attempted to defraud Oppenheimer & Co. in Portsmouth, NH; in violation of Title 18 United States Code, Section 1343.  This affidavit is based on my personal participation in the investigation, as well as information provided to me by other law enforcement officers and witnesses as described, herein.  The information contained in this affidavit is being submitted for the limited purpose of establishing probable cause in order to secure a criminal complaint and arrest warrant.  Therefore, this affidavit does not set forth all of the information gathered during this investigation.

     6.  Title 18, United States Code, § 1343, <u>Wire Fraud</u>, provides in part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice…;
>
> The elements of the crime of wire fraud are:

    First, a scheme, substantially as charged in the indictment, to defraud or to obtain money or property by means of false or fraudulent pretenses;

    Second, defendant's knowing and willful participation in this scheme with the intent to defraud; and

    Third, the use of interstate, or foreign wire communications, on or about the date alleged, in furtherance of this scheme.

  "Interstate, or foreign, wire communications" include telephone communications from one state to another, or between the United States and a foreign country.  The term also includes a wire transfer of funds between financial institutions.

Pattern Crim. Jury Instr. 1st Cir. § 4.13 (1998).


    7.   Ahmed Shaaban does business as Fulcrum Asset Management Chicago.  Fulcrum claims to be an investment advisor/investment banking firm.

    8.   Shaaban opened a Fulcrum account at Oppenheimer and Co. in Portsmouth, NH.  Shaaban spoke to an investment advisor at Oppenheimer, now referred to as CW #1, regarding the ability for Oppenheimer to custody three $50 million UA Insurance bonds and thereafter to obtain a line of credit from Oppenheimer against those bonds.  Shaaban would thus gain access to millions of dollars of Oppenheimer funds.  The three bonds state they are "fully paid and non-assessable Medium Term Note, of UA Insurance Holdings, Inc."  The bonds have an ISIN Number of CA90254PAA62 and the CUSIP number is 90254PAA6.  The three notes claim to be issued on August 14, 2010 with a maturity date of August 15, 2014.  The three bonds are listed as CA 0013, CA 0014, and CA

0015, each for $50,000,000.  Shaaban told CW #1 that the bonds belong to Mark Britain and Paul Ubsdell of LLPP Insure Ltd.

9.  CW #1 advised that his firm researched the existence of the bonds and believed they were fraudulent.  On January 19, 2011, a Securities and Exchange Commission Senior Staff Accountant researched the validity of the bonds in question.  Gera advised that no such security exists per review of Bloomberg's listing of bonds.  That Staff Accountant advised that an Internet search showed the ISIN number does come back to UA bonds listed on the Frankfurt Exchange.  These bonds have a different denomination and different issue and maturity dates.  The ISIN numbers correspond with UA Insurance Holdings bonds with an Issue date of January 31, 2010, Maturity date of January 31, 2014, and are in increments of $10 million each.

10.  On January 6, 2010, CW #1 made a telephone call to Shaaban.  CW #1 indicated to Shaaban that there was a problem with the bonds but there was a way CW #1 and Shaaban could still make money but they would need to have a private conversation in Portsmouth, NH.

11.  Shaaban thereafter notified CW #1 that he will be available to meet in Portsmouth, NH, on January 18, 2011.  Shaaban told CW #1 that Paul Ubsdell and Mark Britain will fly in from the United Kingdom to attend the meeting.

12.  On January 14, 2011 CW#1 contacted Shaaban and advised him that he believed the bonds were not good.  Shaaban wanted CW#1 to still attempt to custody and obtain a line of credit on

the bonds and wanted to speak in person with CW#1 on January 18, 2011.

15. On January 17, and the early morning of January 18th, Ahmed Shaaban, Mark Britain, and Paul Ubsdell flew into Boston, MA and traveled to the Wentworth By The Sea, located in New Castle, NH.

16. On January 18, 2011, at approximately 11:30 am, CW#1 individually met with Shaaban. CW #1 told Shaaban that the bonds were fraudulent and not worth anything. CW #1 told Shaaban that he has "someone on the inside" who can change the CUSIP numbers in order to get Oppenheimer to custody the bonds and extend a line of credit.

17. Upon unequivocally being told by CW#1 that the bonds were fraudulent, but that CW#1 could alter the Cusip numbers to make the bonds look legitimate in order to draw a line of credit Shaaban advised that he identified three key elements: the role of Oppenheimer, the role of CW#1, and his role.

18. CW#1 advised he could custody $250 million in bonds at Oppenheimer and most likely obtain a $187,500,000 credit line against those bonds. CW#1 and Shaaban agreed that they could carve out $60 million of the credit line to themselves as "gratitude." Shaaban told CW #1 that he doesn't care if the bonds have the value of "gold or fucking toilet paper."

19. Throughout the conversation between Shaaban and CW#1, Shaaban continually made references to the risk associated to

5

CW#1, Shaaban, Ubsdell and Britain for their roles in the fraud scheme. At a point in the conversation, Shaaban commented that in the end, Ubsdell was "fucking financing his own fraudulent collateral." Shaaban advised CW#1 that he wanted to insulate them from risk and make CW#1 "bulletproof". Shaaban advised they should keep money to make the interest payments on the bonds so they won't get caught when an interest payment comes due.

20. CW#1 wanted Shaaban to first meet with Ubsdell and Britain before CW#1, Shaaban, Ubsdell and Britain met. CW#1 told Shaaban to tell Ubsdell and Britain that the bonds were fraudulent and that they should only agree to meet with CW#1 if they were interested in becoming involved in a scheme to obtain a line of credit from the fraudulent bonds.

21. Shaaban and CW #1 discussed the need for CW#1 and his insider to be paid. Shaaban stated he would pay CW#1 $10 million after the line of credit was funded. The payments would come in two installments of $5 million each.

22. CW#1 advised Shaaban that his inside guy would need at least $50,000 in an upfront payment to be able to change the cusip numbers. Shaaban advised he would speak with Britain and Ubsdell prior to the four having a group meeting. After Shaaban's meeting with Ubsdell and Britain but prior to the four meeting he would text, in code words, what they would be willing to pay the insider working for CW#1. Shaaban advised that if he texted that they offered $xx to rent a car, then that number would represent the money Ubsdell and Britain would be prepared

6

to wire immediately for payment to CW#1's insider.  If Shaaban texted $yy to buy the car, then that would represent how much money they would pay after the line of credit was funded.       .

23.    At the conclusion of this meeting, Shaaban met with Ubsdell and Britain in the main lobby of the Wentworth Hotel.

24.    After CW#1's meeting with Shaaban, but before CW#1 met with Shaaban, Ubsdell, and Britain, CW #1 received a SMS message from Shaaban's cell phone that said, "U CAN PROB LEASE THAT CAR FOR 150 – 200K WITH A 50K REBATE. U CAN BUY IT FOR 1-2 MILLION TOTAL."  CW #1 responded with a text message that read, "OK.  I WILL BE BACK IN SUITE IN FIVE MINUTES…SORRY FOR DELAY…SNOW KILLING ME."  Shaaban responded with "TAKE TIME. WE R IN LOBBY. ILL COME DOWN WHEN UR READY.  I TOLD THEM TO PLAN FOR ONE MILLION EACH CAR.  TWO CARS."  CW #1 replied, "OK PLUS 10 MILLION?"  Shaaban replied, "YES.  FIVE MILLION FOR EACH BOAT."

25.    At approximately 2:15 pm, CW #1 met with Shaaban, Britain, and Ubsdell.  Recapping his meeting with Britain and Ubsdell, Shaaban stated that he talked about the mechanics and nature of the transactions and told them directly that the bonds are nothing but a piece of paper.  Shaaban explained that although Ubsdell and Britain said they were slightly pissed off they in fact had acknowledged that they suspected the bonds were fraudulent.  CW#1 directly asked Ubsdell and Britain if they suspected the bonds were fraudulent to which Ubsdell and Britain agreed that they did.  Shaaban then stated, "If we can't move forward with the understanding that these bonds are just paper, then we can't move forward at all."  The group agreed to move forward to obtain a line of credit from the fraudulent bonds.

26. Although Ubsdell and Britain agreed to enter a scheme to defraud Oppenheimer of the line of credit they advised they had purchased the bonds legitimately for $10 million and had spent $2.5 million in additional costs related to unlocking the value of the bonds.

27. When asked by either Ubsdell or Britain if it was a "serious, serious" fraud, CW#1 explained the mechanics by which his trader would alter the cusip numbers. When asked whether CW#1 was "legitimizing" the bonds by his trader's actions, CW#1 explained there was nothing about the bonds that were real. CW#1 advised if they believed the bonds were legitimate, they should try to present them at other banks to see if they are accepted. Ubsdell or Britain said they had tried to place the bonds elsewhere with no success.

28. CW#1 advised the group that they could custody up to $250 million worth of UA Bonds and would most likely secure a 90% line of credit against the value of those bonds.

29. Ubsdell and Britain agreed to pay CW#1 $150,000 to initiate the scheme. CW#1 stated that this money was necessary for him to pay his guy to do what he had to do. Ubsdell, Britain and Shaaban asked CW#1 if the chance of this scheme succeeding was 100%. CW#1 assured them that it was. CW#1 advised he would have the three $50 million bonds couriered to New York on January 19th and that they would receive their credit line on Tuesday, January 25th, 2011.

30. Ubsdell or Britain asked how many bonds that CW#1

could custody and obtain a credit line from. CW#1 stated that $250 million in bonds kept it under the radar and that bells and whistles would go off if it rose above this amount. Ubsdell or Britain advised that $250 million must be a "trigger point" which would invite more scrutiny.

31. Along with the aforementioned bonds, CW #1 received a letter from Paul Ubsdell, which claims to be his authorization to deposit the three certificates into an account at Oppenheimer, account #                    , N/O: Fulcrum Asset Management Inc. This is the account that Shaaban established at Oppenheimer. Additionally, CW #1 received a form titled "Corporate Resolution to clear stock." This form, complete with a seal, lists Mark Britain as President and Paul Ubsdell as Vice President of LLPP Insure.

32. On January 19, 2011, CW #1 received a wire into his Bank of America account in the amount of $150,000 from Paul Ubsdell, LLPP Insure LTD, through NatWest Bank.

33. Based on the above, I believe probable cause exists that on January 19, 2011 and dates prior Paul Ubsdell and Mark Britain committed and attempted to commit Wire Fraud, in violation of Title 18, United States Code, Section 1343.

        \_/s/ Matthew K. O'Neill\_\_\_
           Matthew K. O'Neill
           Special Agent, USSS

Subscribed and sworn before me this 19th day of January 2011, at Concord, New Hampshire.

    _____
        Landya B. McCafferty
   United States Magistrate Judge